**SO ORDERED.**

**SIGNED this 27 day of April, 2010.**



_____
                ROBERT E. NUGENT
    UNITED STATES CHIEF BANKRUPTCY JUDGE

_____

OPINION DESIGNATED FOR ON - LINE PUBLICATION
BUT NOT PRINT PUBLICATION

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| TEAM FINANCIAL, INC., | ) | Case No. 09-10925 |
| | ) | Chapter 11 |
| Debtor. | ) | |
| _____ | ) | |
| | ) | |
| IN RE: | ) | |
| | ) | |
| TEAM FINANCIAL ACQUISITION | ) | Case No. 09-10926 |
| SUBSIDIARY, INC., | ) | Chapter 11 |
| | ) | |
| Debtor. | ) | |
| _____ | ) | |
| | ) | |
| IN RE: | ) | |
| | ) | |
| POST BANCORP, INC., | ) | Case No. 09-10927 |
| | ) | Chapter 11 |
| Debtor. | ) | |
| _____ | ) | |
| | ) | |

-1-

| TEAM FINANCIAL INC., TEAM FINANCIAL | ) |
| ACQUISITION SUBSIDIARY, INC., and POST | ) |
| BANCORP, INC., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| vs. | )      **Adversary No. 09-5084** |
| | ) |
| FEDERAL DEPOSIT INSURANCE | ) |
| CORPORATION, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION

Defendant Federal Deposit Insurance Corporation (FDIC) moves for summary judgment on the complaint of the plaintiff-debtor bank holding companies for turnover of property of the bankruptcy estates claimed by the FDIC as receiver for TeamBank, one of the plaintiffs' banks closed by the United States Comptroller of the Currency in March of 2009. The FDIC claims a tax refund emanating from the plaintiffs' 2008 consolidated tax return that is payable to the plaintiffs under a Tax Allocation Agreement entered into on January 8, 2008 by plaintiffs, TeamBank, and other affiliated entitites. The FDIC contends that the tax refund is not property of the bankruptcy estates of these debtor bank holding companies, but rather should be paid to the FDIC as receiver as the separate property of the failed banks.[1] The FDIC's summary judgment motion requires the Court to interpret the Tax Allocation Agreement at issue here and apply applicable bankruptcy and tax law to the uncontroverted facts.

Jurisdiction

---

[1] Adv. Dkt. 37.

This turnover proceeding is a core proceeding under 28 U.S.C. § 157(b)(2)(A) and (E) and the Court has subject matter jurisdiction under 28 U.S.C. §§ 157(b)(1) and 1334(b).

<u>Summary Judgment Standards</u>

Federal Rule of Civil Procedure 56(c) directs the entry of summary judgment in favor of a party who "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."[2] An issue is "genuine" if sufficient evidence exists "so that a rational trier of fact could resolve the issue either way" and "[a]n issue is 'material' if under the substantive law it is essential to the proper disposition of the claim."[3] When confronted with a fully briefed motion for summary judgment, the court must ultimately determine "whether there is the need for a trial – whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."[4] In determining whether any genuine issues of material fact exist, the Court must construe the record in a light most favorable to the party opposing the summary judgment.[5] Once the Court determines which facts are not in dispute, it must then determine whether those uncontroverted facts establish a sufficient legal basis upon which to grant movant judgment as a matter of law.[6]

<u>Uncontroverted Material Facts</u>

---

[2] Fed. R. Civ. P. 56(c).

[3] *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir.1998).

[4] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

[5] *McKibben v. Chubb*, 840 F.2d 1525, 1528 (10th Cir.1988) (citation omitted).

[6] *E.E.O. C. v. Lady Baltimore Foods, Inc.*, 643 F.Supp. 406, 407 (D.Kan.1986) (Even if there are no genuine issue of material fact, the movant still has the burden to show it is entitled to judgment as a matter of law.).

Case 09-05084   Doc# 53   Filed 04/27/10   Page 3 of 24

The facts presented by the parties are not in dispute and are brief. The Court summarizes those facts here for purposes of determining the summary judgment motion.

Plaintiffs Team Financial, Inc. ("Team"), Team Financial Acquisition Subsidiary, Inc. ("TFAS") and Post Bancorp, Inc.("Bancorp") are bank holding companies, owning all of the stock in TeamBank N.A. ("TeamBank") and Colorado National Bank ("CNB").[7]  All of these entities are members of an affiliated group of corporations with Team as the common parent corporation and constitute a Consolidated Tax Group.[8]  Plaintiffs, TeamBank and CNB filed a consolidated federal income tax return for tax year 2008 as they are permitted to do under the Internal Revenue Code, 26 U.S.C. § 1501.[9]  This Consolidated Tax Group entered into a Tax Allocation Agreement ("TAA") on January 2, 2008.

The TAA provides, in part:

. . .

WHEREAS, the parties to this Agreement wish to establish a method for allocating the consolidated Federal Income Tax Liability of the Group . . . amount [sic] its Members . . ., *reimbursing Team Financial, Inc. [the parent] for payment of such tax liability*, *compensating each Member . . . for use of its Net Operating Loss* and tax

---

[7]  The Court may refer to plaintiffs, TeamBank, CNB and its other affiliated entities collectively as the "Consolidated Tax Group" from time to time in this opinion. The Court recognizes that three other affiliated entities are included in the Consolidated Tax Group: TeamBank, N.A. Asset Corporation, TBNA Holdings, LLC, and TBNA REIT, LLC, but their presence is not material to the Court's determination and for ease of reference, the Court includes them when referencing the Consolidated Tax Group.

[8]  *See* Dkt. 43-1 (Tax Allocation Agreement).

[9]  All subsequent statutory references to provisions of the Internal Revenue Code, Title 26, shall be referenced as "IRC § ___." The purpose of allowing a consolidated tax return was described in *American Standard, Inc. v. United States,*, 602 F.2d 256, 261 (Ct. Cl. 1979): ". . . to permit affiliated corporations, which may be separately incorporated for various business reasons, to be treated as single entity for income tax purposes as if they were, in fact, one corporation . . . the tax is computed solely on basis of consolidated taxable income."

-4-

credits and to in general preserve the economic rights and obligations which would accrue to each from the filing of separate federal income tax returns, all as hereinafter set forth.[10]

. . .

III.     <u>Filing of Consolidated Return and Payment of Tax.</u>  For each Taxable Year during the term of this Agreement, Team Financial, Inc. [the parent] shall file a Consolidated Return . . . on behalf of the Group, all of which shall be filed on a timely basis.  For each Taxable Year during the term of this Agreement, *Team Financial, Inc. shall pay the Federal Income Tax Liability of the Group . . .[11]*

IV.     <u>Allocation of Tax Liability.</u>  The Members of the Group shall allocate their Federal Income Tax Liability in the following manner:

(A) (i) . . . the Federal Income Tax Liability of each Member of the Group shall be *calculated* as if such Member were filing a separate federal income tax return for the Taxable Year of such Member included in the Group's Consolidated Return . . .
(ii) In computing each Member's Separate Return Liability . . .
        (c) The amounts in each taxable income bracket set forth in Section 11(b) of the Code *shall be allocated* in any given year to the Members of the Group *as Team Financial, Inc. shall elect provided, however, that the amount allocated to any Member shall not exceed said Member's separate taxable income as computed hereunder.*

. . .

(B) Each Member of the Group *shall pay to Team Financial, Inc.* such amounts as are equal to its own Estimated Tax computed as if the member had continued to file separate returns. . . . The excess (if any) of the amount paid by the Members to Team Financial, Inc. over the amount remitted by Team Financial, Inc. to the depository bank as an Estimated Tax payment for the Group *shall be distributed* by Team Financial, Inc. among those Members anticipating a Net Operating Loss *by a method consistent with Section 4(c)(iii) [sic] hereof*, which distribution shall be considered as a partial advance of their respective income tax benefit for such year.

. . .

(C) (i) Each Member of the Group *shall pay* to Team Financial, Inc. an amount equal

---

[10]  Dkt. 43-1, p. 1 [Emphasis added].

[11]  *Id.* at ¶ III., p. 2 [Emphasis added].

-5-

to the excess, if any, of such Member's separate Return Liability over the amount of Estimated Tax previously paid by such Member to Team Financial, Inc. with respect to said Taxable Year.

(ii) Team Financial, Inc. *shall pay* to each Member of the Group an amount equal to the sum of:
(a) The excess, if any, of Estimated Tax previously paid by such Member to Team Financial, Inc. with respect to said Taxable Year over the Member's Separate Return liability; plus
(b) The federal income tax refund to which the Member would have been entitled by reason of any Carryback of *consolidated* Net Operating Less [sic], . . . if the Member had been filing separate return.

(iii) Team Financial, Inc. *shall pay* to each Member with a Net Operating Loss . . . with respect to a Taxable Year its allocable share of the aggregate amounts paid by the Member to Team Financial, Inc., with respect to such Taxable Year. *. . . to the extent such allocable share is attributable to a Carryback, such payments shall be made within 30 days of Team Financial, Inc.'s receipt of appropriate federal income tax refunds due to the Carryback. The allocable share of a Member pursuant to this Section 4(c)(iii) [sic] shall be determined by Team Financial Inc. pursuant to a consistent method which reasonably reflects the tax benefit derived by the Group from the items of Net Operating Less [sic] . . . of such Member.*

. . .

(v) . . . payments made under Section 4(c)(ii)(B) [sic] hereof shall be made upon Team Financial, Inc.'s receipt of appropriate federal income tax refunds due to the Carryback.[12]

On March 20, 2009, the United States Comptroller of the Currency closed TeamBank and CNB and the Federal Deposit Insurance Corporation ("FDIC") was appointed their receiver. On April 5, 2009 Team, TFAS and Bancorp each filed voluntary chapter 11 petitions. The debtors filed this adversary complaint on May 22, 2009. The parties agreed to the entry of an order providing for the deposit of all tax refunds in an escrow account jointly titled in the plaintiffs and the FDIC pending a determination by the Court regarding the ownership of the refunds.[13] As of December

---

[12] *Id.* at ¶ IV, pp. 2-4.

[13] Adv. Dkt. 25.

21, 2009, plaintiffs had filed their 2008 consolidated federal income tax return but had yet to receive and deposit any refund from the Internal Revenue Service ("IRS") in the escrow account.[14] At a status hearing on April 22, 2010, the parties reported that some, but not all of the anticipated refunds had been received. The receipts are on deposit in the escrow account. According to Team's CPA employed in the bankruptcy case, it is anticipated that a significant refund will be due as a result of a 2008 net operating loss carryback.[15] The claims register in these cases show that the FDIC filed a proof of claim (claim 14) on November 11, 2009 asserting *inter alia* a right to and ownership of the tax refunds at issue here. According to the FDIC, its tax refund claim is unliquidated but is in the approximate amount of $3.3. million.

What is not apparent in the record is whether the anticipated tax refund expected to be generated by the net operating loss carry back is attributable to TeamBank's and/or CNB's losses against their prior income and the amount of such losses. The parties do not identify which entities in the Consolidated Tax Group were operating entities, although presumably TeamBank and CNB were. This begs the question whether any of the other affiliated entities are operating entities that would have generated income or losses. Nor is it apparent from the record before the Court the amount of the Consolidated Tax Group's taxable income or tax liability for any year or the amount of tax liability paid by the members of the Consolidated Tax Group in those years.

---

[14] The 2008 consolidated tax return is not a part of the record before the Court.

[15] In general, the 2008 operating loss of the Consolidated Tax Group will be carried back and offset against the taxes paid by the Consolidated Tax Group in prior years on prior years' income, thus generating a refund. CPA John Goss, was hired to prepare Form 1139 to show the 2008 net operating loss carry back. According to Mr. Goss' affidavit attached in support of the plaintiff's response, Form 1139 was to be filed by December 31, 2009; there is no indication if Form 1139 has been completed and filed and it is not part of the summary judgment record.

-7-

The FDIC contends that any consolidated federal income tax refunds that the plaintiff bank holding companies receive are held by them as agents or trustees for TeamBank and CNB because the refunds are attributable to the closed banks' earnings. Therefore, the tax refunds are property of TeamBank and CNB, and are not property of the holding companies' bankruptcy estates. The FDIC bases its position on case law, Treasury Regulation § 1.1502-77, Bankruptcy Code § 541(d), its interpretation of the TAA, and banking law and policy.

Plaintiffs deny the existence of an agency or trust relationship and contend that the TAA is nothing more than an agreement or contract concerning how the Consolidated Tax Group would deal with tax liability and refunds. Team claims that it owns the tax refund, that it is property of the bankruptcy estate, and that the closed banks and their receiver are merely Team's creditors. Plaintiffs also rely on case law and interpretation of the TAA.

Analysis

11 U.S.C. § 541 broadly defines what interests constitute property of the bankruptcy estate.[16] That section provides, in part:

(a) . . . Such estate is comprised of all the following property, wherever located and by whomever held:
(1) . . . all legal or equitable interests of the debtor in property as of the commencement of the case.[17]

In bankruptcy proceedings, the nature and substance of interests in property are determined by

---

[16] *United States v. Whiting Pools, Inc.,* 462 U.S. 198, 204, 76 L.Ed. 2d 515, 103 S. Ct. 2309 (1983) (The congressional goal of encouraging reorganizations and statutory language suggests that Congress intended that "a broad range of property" be included in the estate and the debtor need not have a possessory interest at the time of bankruptcy filing).

[17] Section 541(a)(1).

-8-

reference to state law; thus, the debtors' interest in the subject tax refunds must be determined under Kansas law.[18]  Here the TAA expressly provides that it will be governed by Kansas law.[19]

I.   **Does the Tax Allocation Agreement [TAA] Create an Express Trust with Respect to Tax Refunds and Team's Handling as a Trustee?**

The Court first examines Team's interest in the tax refunds under the TAA.  Specifically, the Court considers the TAA to determine if under it Team is to hold any tax refunds in trust for the Consolidated Tax Group.  In other words, does the TAA create a trust that settles the tax refunds on Team for the benefit of the other affiliated entities?   As discussed below, the Court concludes that it does not.

Under Kansas law, the three features of an express trust are: (i) an explicit declaration and intention to create a trust; (ii) definite property or subject matter of the trust; and (iii) the acceptance and handling of the subject matter by the trustee as a trust.[20]  Kansas case law uniformly holds that separation of the legal and equitable interests in the property is fundamental to the existence of any trust.[21]

There is no language within the four corners of the TAA that evidences either an intent or declaration of a trust with respect to the Consolidated Tax Group's tax refunds.  No language expressly identifies either Team or any other member of the Consolidated Tax Group as a trustee charged with holding property for other members of the Consolidated Tax Group.  Nor does the

---

[18]  *Butner v. United States,* 440 U.S. 48, 54-55, 99 S.Ct. 914, 59 L.Ed. 2d 136 (1979).

[19]  *See* Dkt. 43-1, Section XI (A).

[20]  *Taliaferro v. Taliaferro,* 260 Kan. 573, 578-79, 921 P.2d 803 (1996). *See also,* KAN. STAT. ANN. §§ 58a-401(2) and 58a-402 (2005)

[21]  *Id.* at 580.

Case 09-05084    Doc# 53    Filed 04/27/10    Page 9 of 24

TAA identify any property that constitutes the trust *res*. Nowhere in the TAA does Team agree to accept and handle tax refunds *as a trustee* of the Consolidated Tax Group. Thus, the Court finds none of the three elements that Kansas law requires to create an express trust in its study of the TAA. Instead, Team and the other members of the Consolidated Tax Group have entered into a contract that allocates among the parties certain obligations for paying the group's tax liability and distributing any overpayments that may be attributed to loss carrybacks. The TAA falls far short of creating an express trust.

The FDIC does not point to any language in the TAA that creates an express trust. It concedes the absence of language in the TAA that speaks to Team's status as an agent or trustee. Instead, the FDIC suggests that the agent-trustee relationship is a "default" condition whose existence in this case can be negatively *implied* from the TAA.

> Nothing in the [TAA] in this case states that the Debtors shall *not* be agent-trustees with respect to tax refunds paid to them by the Internal Revenue Service.[22]

This argument hinges not upon the language of the TAA, but upon the FDIC's interpretation of Treas. Reg. § 1.1502-77, which the FDIC contends makes all holding companies the agent-trustee for their respective consolidated tax groups with respect to tax refunds. It reasons that by omitting any mention of the trust relationship, the parties to the TAA did not intend to alter it. The Court observes that the only language in the TAA that explicitly speaks to an agency relationship is found in Section I(H): "For purposes of intercompany tax payments, as well as payments to the Service, Team Financial, Inc. *may designate any member of the Group as its agent.*"[23] This language plainly

---

[22] Dkt. 37, p. 18.

[23] Dkt. 43-1, p. 2.

-10-

does not impose agency duties on Team for the benefit of the Group and, apart from this language, there is no other mention of an agency or trust relationship in the TAA. The Court therefore concludes that while Team may have contractual obligations under the TAA in its handling or distribution of the tax refund, nothing in the TAA operates to elevate those duties to the level of an express trust nor designates Team or the debtors as trustees or agents for the affiliated entities in the Consolidated Tax Group.

### II. As a Matter of Law, Does Treas. Reg. § 1.1502-77 make Team an Agent or Trustee for the Consolidated Tax Group with Respect to Tax Refunds?

Having determined that the TAA fails to establish an express trust with respect to the Consolidated Tax Group's tax refunds, the Court turns to Treas. Reg. § 1.1502-77 (eff. July 23, 2007). The FDIC contends that this regulation mandates that debtors hold any tax refunds received from the IRS in trust for or as the agent of the members of the Consolidated Tax Group. The FDIC relies heavily upon this regulation as creating an agency or trust relationship between Team and the members of the Consolidated Tax Group. Presumably, the FDIC seeks to use this regulation to demonstrate that Team, as an agent for the members of the Consolidated Tax Group, holds bare legal title to the tax refund and therefore, the tax refund is not property of the debtors' bankruptcy estates under 11 U.S.C. § 541(d).[24]

Treas. Reg. § 1.1502-77 provides:

Except as provided in paragraphs (a)(3) and (6) of this section, the common parent . . . for a consolidated return year is the sole agent (agent for the group) that is

---

[24] Section 541(d) states that "[p]roperty in which the debtor holds, as of the commencement of the case, only legal title and not an equitable interest, . . . becomes property of the estate under subsection (a)(1) or (2) of this section only to the extent of the debtor's legal title to such property, but not to the extent of any equitable interest in such property that the debtor does not hold."

authorized to act in its own name with respect to all matters relating to the tax liability for that consolidated return year, for – (A) Each member in the group; and (B) Any successor (see paragraph (a)(1)(iii) of this section) of a member.[25]

Subsection (a)(2) of the regulation gives examples of matters for which the common parent acts as agent for the members of the consolidated tax group. Some examples include: elections available to a subsidiary in computing its separate taxable income; correspondence concerning the income tax liability for the consolidated return year; extensions of time; offers in compromise; notices of claim disallowance; notices of deficiencies; petitions before the United States Tax Court; assessment of tax; and notice and demand for payment of taxes.[26] The common parent also acts as an agent when it files "claims for refund, and any refund is made directly to and in the name of the common parent and discharges any liability of the Government to any member with respect to such refund."[27] The regulation does not purport to decree who "owns" the refund as between the parent and the members of the group.

The Court reads § 1.1502-77 to make the common parent of the affiliated entities "the spokesman" for the group and ensure that the IRS can efficiently deal with only one member of the Consolidated Tax Group without incurring liability to other members of the Consolidated Tax Group or having to deal with each and every member of the group and be subjected to differing or conflicting authority. It makes the administration of consolidated tax returns more efficient. Section 1.1502-77(a)(3) specifies those matters for which a member's authority to act for or to represent itself is reserved.

---

[25] Treas. Reg. § 1.1502-77(a)(1)(i).

[26] *See* Treas. Reg. § 1.1502-77(a)(2)(i)-(iv), (vii)-(xii).

[27] *Id.* at § 1.1502-77(a)(2)(v).

-12-

This interpretation of Treas. Reg. § 1.1502-77 is consistent with that of a number of courts that have considered the nature of the common parent's "agency" under the regulation. In the seminal *Bob Richards* case, the Ninth Circuit Court of Appeals said this about the regulation then in effect:

> The only reason for the tax refunds not being paid directly to the subsidiary is because income tax regulations require that the parent act as the sole agent, when duly authorized by the subsidiary, to handle all matters relating to the tax return. Accordingly, the refund is made payable to the parent and the acceptance of the refund by the parent discharges any liability of the government to any subsidiary. *But these regulations are basically procedural in purpose and were adopted solely for the convenience and protection of the federal government.*[28]

Other cases are in accord.[29] In addition, several courts have concluded that the Internal Revenue Code does not address which entity in a consolidated tax group is ultimately entitled to receive the consolidated tax refund.[30] As stated in *Bob Richards*:

> The Internal Revenue Service is not concerned with the subsequent disposition of tax refunds and none of its regulations can be construed to govern this issue [entitlement to the refund].[31]

---

[28] Emphasis added. *In re Bob Richards Chrysler-Plymouth Corp., Inc.* 473 F.2d 262, 265 (9th Cir. 1973), *cert. den. sub nom. Western Dealer Management v. England*, 412 U.S. 919 (1973).

[29] *See e.g., In re Prudential Lines, Inc.,* 928 F.2d 565, 571 (2d Cir. 1991) (*citing Bob Richards*); *Jump v. Manchester Life & Cas. Management Corp.,* 579 F.2d 449, 452 (8th Cir. 1978) (parent's agency relationship with members in affiliated group "is for the convenience and protection of IRS only and does not extend further."); *In re Franklin Sav. Corp.,* 159 B.R. 9, 29 (Bankr. D. Kan. 1993), *aff'd* 182 B.R. 859 (D. Kan. 1995) (Treas. Reg. § 1.1502-77(a) confers no substantive rights); *In re First Cent. Financial Corp.,* 269 B.R. 481, 489 (Bankr. E.D. N.Y. 2001), *aff'd* 377 F.3d 209 (2d Cir. 2004) (the agency under § 1.1502-77(a) is "purely procedural in nature, and does not affect the entitlement as among the members of the Group to any refund paid by the I.R.S.").

[30] *Jump, supra* at 452; *Capital Bancshares, Inc. v. Federal Deposit Ins. Corp.,* 957 F.2d 203, 206 (5th Cir. 1992); *In re First Cent. Financial Corp., supra* at 489.

[31] *Bob Richards, supra* at 265.

-13-

The Court's conclusion as to the effect of § 1.1502-77(a) is buttressed by its reading of another similar regulation that specifically applies to financial institutions and that neither of the parties to this motion mentions. Treas. Reg. § 301.6402-7(a) provides:

(1) **Overview.** Section 6402(i) authorizes the Secretary to issue regulations providing for the payment of a refund directly to the statutory or court-appointed fiduciary of an insolvent corporation that was a subsidiary in a consolidated group, to the extent the Secretary determines that the refund is attributable to losses or credits of the insolvent corporation. *This section provides rules for the payment of refunds and tentative carryback adjustments to the fiduciary of an insolvent financial institution that was a subsidiary in a consolidated group.*

(2) **Notice.** This section provides notice to the common parent of a consolidated group of which an insolvent financial institution is or was a member that – (i) The fiduciary for the institution may, in addition to the common parent, act as agent for the group in certain matters relating to the tax liability of the group in the year in which a loss arose and for the year to which a claim for refund or application for tentative carryback adjustment relates; and (ii) The Internal Revenue Service may deal directly with the common parent or the fiduciary (or both) as agent for the group to the extent provided in this section.[32]

Section 301.6402-7(c) further provides that:

Notwithstanding the general treatment of a common parent as the agent of a group under §§ 1.1502-77 and 1.1502-78 of this chapter, if the fiduciary satisfies the notice requirements of paragraph (d)(1) of this section, the fiduciary may also be deemed to be an agent under §§ 1.1502-77 and 1.1502-78 of this chapter . . . (ii) of the carryback year group for purposes of filing a claim for refund or an application for a tentative carryback adjustment for the consolidated carryback year under paragraph (e) of this section and receiving payments of any refund or tentative carryback adjustment under paragraph (g) of this section . . .

Finally, § 301.6402-7(j) makes clear that the agency status conferred upon the FDIC or the common parent does not determine the ownership of the refund. It states:

This section determines the party to whom a refund or tentative carryback adjustment

_____

[32] Emphasis added. Note that Section 301.6402-7(b)(3) defines the FDIC as a fiduciary. Section 301.6402-7(b)(4) defines an insolvent financial institution as a bank for which the FDIC is authorized to act as a receiver or conservator.

-14-

will be paid *but is not determinative of ownership of any such amount among current or former members of a consolidated group (including the institution).*[33]

In short, Treas. Reg. § 301.6402-7 confers agency status upon the FDIC for the purpose of administrative convenience in dealing with consolidated group tax refunds and loss carrybacks involving insolvent financial institutions in the same manner as does Treas. Reg. § 1.1502-77 generally. But, like Treas. Reg. § 1.1502-77, it does not determine the ownership of any overpayment or refund.

The Court concludes that the "agency" status conferred on Team by the Treasury Regulations does not determine the ownership of a tax refund resulting from a NOL carryback and that Team does not hold a tax refund received from the IRS in trust for the members of the Consolidated Tax Group. Neither the Internal Revenue Code nor the regulations determine who owns a tax refund as among the members of the Consolidated Tax Group. Accordingly, the Court cannot conclude as a matter of law that Team owns only a legal interest in the tax refund based solely upon its agency described by Treas. Reg. § 1.1502-77.

### III.    Is the TAA Permitted by Law and Enforceable?

Having concluded that neither the TAA nor Treas. Reg. § 1.1502-77 creates a trust or agency relationship requiring Team to hold the tax refund for the benefit of the members of the Consolidated Tax Group, the Court next considers what effect should be given to the TAA in determining ownership of the tax refund. The *Bob Richards* case states the general rule regarding the rights of group members to a consolidated tax refund as follows:

> . . . [*I*]*n the instant case the parties made no agreement concerning the ultimate disposition of the tax refund. Absent any differing agreement* we feel that a tax

---

[33] Emphasis added.

refund resulting solely from offsetting the losses of one member of a consolidated filing group against the income of that same member in a prior or subsequent year should inure to the benefit of that member. Allowing the parent to keep any refunds arising solely from a subsidiary's losses simply because the parent and subsidiary chose a procedural device to facilitate their income tax reporting unjustly enriches the parent.[34]

The parties to the TAA in this case made a "differing agreement," taking this case out of the *Bob Richards* general rule. As the *Bob Richards* court noted, parties in a consolidated group "are free to adjust among themselves" by an explicit agreement, the ultimate disposition of a tax refund.[35] The Team tax group did exactly that.

The question then becomes whether there is any reason by which the TAA is unenforceable. The FDIC cited no provision in either the Internal Revenue Code or treasury regulations that would prohibit members in a consolidated tax group from entering into a TAA. As noted previously, neither the Internal Revenue Code nor the regulations mandate how a consolidated tax refund is to be allocated among and disbursed to the members of a consolidated tax group or determine which entity in a consolidated tax group owns the refund.

A.      The Interagency Policy Statement

The FDIC points instead to an *interagency* policy statement on income tax allocation issued in November of 1998.[36] Not even the FDIC asserts that this policy statement has the force of law. On its face, the policy statement's purpose is to develop a uniform and consistent policy among the FDIC, the Comptroller of the Currency, the Office of Thrift Supervision, and the Federal Reserve

---

[34]  Emphasis added. *Bob Richards,* 473 F.2d at 265.

[35]  *See In re First Central Financial Corp.,* 269 B.R. 481, 488-89 (Bankr. E.D. N.Y. 2001) explaining NOL carryback as a form of income averaging and income tax refunds generated thereby for the consolidated tax group.

[36]  63 Fed. Reg. 64757-01, 1998 WL 804364 (Nov. 23, 1998)

-16-

System regarding intercorporate tax allocation in a holding company structure.[37]  In seeking to set ground rules for tax allocation practices, the policy statement "reaffirms that intercorporate tax settlements between an institution and the consolidated group should result in no less favorable treatment to the institution than if it had filed its income tax return as a separate entity."[38]  Indeed, as Team points out, the combined agencies expressly encourage institutions to enter into tax allocation agreements:

> *Tax Sharing Agreements*
> A holding company and its subsidiary institutions are encouraged to enter into a written, comprehensive tax allocation agreement tailored to their specific circumstances. . . . Although each agreement will be different, tax allocation agreements usually address certain issues common to consolidated groups. Therefore, such an agreement should: . . .
> - Discuss the amount and timing of the institution's payments for current tax expense, including estimated tax payments;
> - Discuss *reimbursements* to an institution when it has a loss for tax purposes; . . .[39]
>
> *Tax Refunds From the Parent Company*
> An institution incurring a loss for tax purposes should record a current income tax benefit and receive a refund from its parent in an amount no less than the amount the institution would have been entitled to receive as a separate entity. . . . If a refund is not made to the institution within this period, the institution's primary federal regulator may consider *the receivable as either an extension of credit or a dividend from the subsidiary to the parent.  A parent company may reimburse an institution more than the refund amount it is due on a separate entity basis.* . . .[40]

Moreover, the policy statement's reference to the parent's agency status for receiving tax refunds on behalf of the consolidated group cites to Treas. Reg. § 1.1502-77(a), the effect of which this

---

[37]  *See American Min. Congress v. Marshall*, 671 F.2d 1251, 1263 (10th Cir. 1982) (An agency cannot rely upon a general statement of policy as law because a general statement of policy only announces what the agency seeks to establish as policy.)

[38]  63 Fed. Reg. at *64757.

[39]  Emphasis added.  63 Fed. Reg. at *64758

[40]  *Id.*

Court has previously addressed. The Court concludes that the interagency policy statement relied upon by the FDIC neither prohibits tax allocation agreements nor renders a tax allocation agreement such as that employed here unenforceable. In fact, it encourages these agreements. The FDIC has not demonstrated on this record that the TAA entered into by the Team Consolidated Tax Group contravenes the stated policy that a group member not receive less favorable treatment than if it had filed its income tax return as a separate entity.

B.         Unfairness, Overreaching or Unconscionable Conduct

Another legal theory could support the FDIC's assault on the TAA. Some states impose a fiduciary duty of fair dealing on a parent corporation in dealing with its subsidiary, similar to the duty of a controlling shareholder toward a minority shareholder of a closely held corporation.[41] Thus, notwithstanding the existence of a written agreement between members of a consolidated tax group for allocating tax liabilities, if a parent acts unfairly or unconscionably, or overreaches through a tax allocation agreement and gains an unfair advantage or benefit over a subsidiary, the courts may intervene and exercise their equitable powers to prevent its enforcement or award the tax refund under a constructive trust theory.[42]

Assuming that the above principles are applicable under Kansas law, the Court cannot conclude on summary judgment that Team or the debtors have implemented the TAA by engaging in unfairness, overreaching or unconscionable conduct that would preclude its enforcement. There are no controverted or uncontroverted facts concerning the amount of tax liability paid respectively

---

[41] *In re Franklin Savings Corp.,* 159 B.R. 9, 29 (Bankr. D. Kan. 1993), *aff'd* 182 B.R. 859 (D. Kan. 1995).

[42] *Id.* at 30. *See also In re First Central Financial Corp.,* 269 B.R. 481, 489-90 (Bankr. E.D. N.Y. 2001).

-18-

by TeamBank, CNB and the debtors or whether the amount of tax liability paid by TeamBank and CNB exceeds the amount of tax they would have paid if calculated as their separate tax liability. There are no facts in the current record concerning (i) the amount of the tax group members' separate taxable income and separate tax liability; (ii) the amount of NOL generated by TeamBank and CNB which resulted in the tax refund; (iii) the amount of NOL, if any, generated by debtors which resulted in a tax refund, (iv) the amount of the tax refund; or (v) any other figures that would demonstrate that, as a matter of law, the application of the TAA unfairly advantaged Team.[43] The FDIC points to no offending provision in the TAA, that when implemented, confers an unfair benefit upon Team or debtors. Indeed, the introductory recital of the TAA signals the parties' intent to "preserve the economic rights and obligations which would accrue to each from the filing of separate federal income tax returns."[44] Subsequent substantive provisions of the TAA appear to the Court to do exactly that, by tying a member's tax obligations to its "Separate Return Liability."[45] In short, there is nothing contained in this summary judgment record that forms a factual predicate upon which the Court could conclude that the debtors acted unfairly or unconscionably in creating and implementing the TAA.

C.    Violation of Banking Law, 12 U.S.C. § 371c

The FDIC also suggests that if enforced, the TAA would violate the limits on certain transactions with an affiliate. 12 U.S.C. § 371c(a)(1) limits a member bank's "covered transactions"

---

[43] *Cf. In re Franklin Savings Corp.,* 159 B.R. at 12-14 (The bankruptcy court was presented extensive stipulations of fact by the parties with regard to the amount and timing of tax payments and refunds and in addition, received evidence and testimony at trial of the adversary proceeding.)

[44] Dkt. 43-1, p. 1.

[45] *See e.g.,* Dkt. 43-1, ¶ IV.(A)(i), (B), and (C)(i) and (ii).

with an affiliate to an amount tied to certain percentages of the member bank's capital stock and surplus.[46]  A covered transaction with respect to an affiliate of a member bank includes a loan or extension of credit to the affiliate.[47]  Certain transactions are exempted from the restrictions.[48]

Even if the TAA triggers these loan restrictions, there is nothing in the summary judgment record before the Court from which it can determine that the TAA violates the restrictions.  At this point in the proceedings, the Court cannot even ascertain the dollar amount of a "covered transaction."

### IV.    The Tax Refunds are Estate Property

Having concluded that the TAA does not create a trust relationship wherein Team holds any tax refund it receives from the IRS for the benefit of TeamBank or CNB, the Court concludes that Team owns the tax refund and it is property of the bankruptcy estate.  This conclusion is supported by certain provisions and language of the TAA as well as *In re Franklin Sav. Corp.*[49] and *In re First Central Financial Corporation.*[50]

The bankruptcy court in *Franklin Savings* focused on the terminology employed in the Tax Reimbursement Agreement at issue in that case.  It found that the use of "reimbursement" language in the agreement whereby the holding company would reimburse the subsidiary for "taxes which

---

[46]  An affiliate is defined for purposes of § 371c as a company that controls the member bank. 12 U.S.C. § 371c(b)(1)(A).

[47]  *See* 12 U.S.C. § 371c(b)(7)(A).

[48]  *See* 12 U.S.C. § 371c(d)(1)(A) (a transaction with a bank that controls 80% or more of the voting shares of the member bank) and (d)(2) (deposits in an affiliated bank in the ordinary course of correspondent business).

[49]  159 B.R. 9 (Bankr. D. Kan. 1993), *aff'd* 182 B.R. 859 (D. Kan. 1995).

[50]  269 B.R. 481 (Bankr. E.D. N.Y. 2001).

-20-

would otherwise have been paid by Franklin [subsidiary] had it not been a member of the Consolidated Group"[51] to be inconsistent with the subsidiary owning the refund. The subsidiary was obligated to pay the holding company the amount of tax computed as a separate tax liability. In the event of a NOL, the subsidiary became "entitled to . . . reimbursement by Parent . . . to the extent of amounts previously paid to Parent . . ."[52] Instead, the bankruptcy court concluded that reimbursement was more consistent with a "debt" or "receivable," and not ownership. If the refund was intended to be the subsidiary's property, the agreement would have provided for "return" of the refund to the subsidiary. The bankruptcy court thus concluded that the parties intended to create an obligation to the subsidiary in the nature of a receivable.[53] The district court agreed, holding that the tax agreements were unambiguous and addressed the conditions under which the subsidiary was entitled to reimbursement of the tax refunds.[54] The fact that the tax reimbursement agreement did not mention the term "ownership" did not create ambiguity.

The FDIC complains at length that *Franklin Savings* was incorrectly decided and should not be relied upon. *Franklin Savings* was decided not on summary judgment, but following a two-day trial, extensive stipulations, and lengthy and detailed findings of fact made by the bankruptcy court. The FDIC's summary judgment memorandum in this case advances several of the same arguments made unsuccessfully by the Resolution Trust Corporation in *Franklin Savings* regarding its claimed

---

[51]  159 B.R. at 14.

[52]  *Id.* at 15.

[53]  *Id.* at 29.

[54]  182 B.R. at 863.

ownership of the tax refunds.[55]  While neither decision in *Franklin Savings* binds this Court as precedent, each is persuasive and merits this Court's consideration.

Also instructive on these issues is the opinion in *In re First Central Financial Corporation, supra.*  There the court dealt with a consolidated tax group consisting of a debtor holding company that owned all of the shares of a subsidiary insurance company.  The state insurance official liquidating the insurance company claimed ownership of a $2.5 million federal income tax refund generated by a NOL carryback as against the bankruptcy trustee of the debtor holding company. The holding company and subsidiary had entered into a tax allocation agreement.  The bankruptcy court there concluded that a debtor-creditor relationship existed, not a trust.  If the parent and subsidiary stood in a debtor-creditor relationship with respect to the tax refund payment due and owing from the parent under the tax allocation agreement, the beneficial interest in the refund was property of the estate.[56]  It noted the absence in the tax allocation agreement of any requirement that the parent segregate the tax refund from other funds and there were no restrictions on the parent's use of the funds.[57]   Finally, the tax allocation agreement provided for "payment" by the parent to the subsidiary of its portion of the tax refund under the tax allocation agreement, also indicative of a debtor-creditor relationship.[58]

> . . . not only is the Agreement devoid of any language purporting to create a trust or agency relationship, it contains language which shows an intent to create ordinary

---

[55]  *See* 182 B.R. at 862.

[56]  269 B.R. 481, 495.

[57]  *Id.* at 496.

[58]  *Id.* at 497.

Case 09-05084    Doc# 53    Filed 04/27/10    Page 22 of 24

contractual obligations between the parties, *not* a fiduciary relationship.[59]

This Court is convinced that the unambiguous language of the TAA at issue here is as compelling as the language employed in the tax agreements in *Franklin Savings* and *First Central Financial Corp.* and a similar conclusion should obtain. The "whereas" clause announces the purpose of the TAA as *"compensating* each Member . . . for use of its Net Operating Loss . . ."[60] Paragraph IV.(C)(ii) imposes a contractual obligation upon Team to pay to members of the Consolidated Tax Group certain amounts to be calculated pursuant to the TAA:

> Team Financial, Inc. *shall pay to each Member of the Group an amount* equal to the sum of: (a) The excess, if any, of Estimated Tax previously paid by such Member to Team Financial, Inc. with respect to said Taxable Year over the Member's Separate Return liability [overpayments]; plus (b) The federal income tax refund to which the Member would have been entitled by reason of any Carryback of consolidated Net Operating Less [sic], unused credit or similar available Carryback items, if the Member had been filing separate return.

Paragraph IV.(C)(iii) similarly requires Team to "pay" members of the Consolidated Tax Group with NOL carrybacks their allocable share of the taxes paid by the Member to Team. The members of the Consolidated Tax Group likewise have a mutual obligation to pay Team for their share of the tax liability. Paragraph IV.(B) provides that "[e]ach Member of the Group *shall pay to Team Financial, Inc.* such amounts as are equal to its own Estimated Tax computed as if the member had continued to file separate returns. Said amounts *shall be payable* on the same date as Team Financial, Inc. pays the Estimated Tax installment for the Group." Nothing in the TAA creates a trust or agency relationship with respect to federal income tax refunds received by Team from the IRS. Nothing in the TAA requires Team to segregate the tax refund, to hold the tax refund in trust

---

[59] *Id.* at 498.

[60] Dkt. 43-1, p. 1.

-23-

for the members of the Consolidated Tax Group, or prohibits Team from using the tax refund. In short, the TAA creates "ordinary contractual obligations" between Team and the members with respect to tax liability and tax refunds. Team is indebted to members of the group with respect to tax overpayments and tax refunds in those amounts specified under the TAA. As such, the relationship between Team and its members with respect to the tax refund is that of debtor and creditor. TeamBank and CNB may assert a claim against the estate for Team's payment obligation under the TAA, but the tax refund is property of the estate.

Conclusion

Because the FDIC is not entitled to judgment as a matter of law, its motion for summary judgment is DENIED. The factual findings made in this Order are deemed established for the purposes of this adversary proceeding as provided by Fed. R. Civ. P. 56(d)(1) and Fed. R. Bankr. P. 7056. The Clerk will schedule a status conference as soon as practicable in this adversary proceeding.

# # #

-24-